IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 20-48 |
| PHILIP ELVIN RIEHL | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

I.      **INTRODUCTION**

On February 27, 2020, the defendant, Philip Elvin Riehl, pled guilty to all three counts of the Information, charging him with conspiracy to commit securities fraud and wire fraud, in violation of 18 U.S.C. § 371 (Count One); securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b–5 and 18 U.S.C. § 2 (Count Two); and wire fraud, in violation of 18 U.S.C. § 1343 (Count Three).

During his plea colloquy, the defendant, a Berks County accountant, admitted to perpetrating a multiyear securities fraud, with hundreds of victims and nearly $60 million in investor losses. Among his investors were members of the Mennonite and Amish religious communities in eastern and central Pennsylvania, including individuals who were clients of his accounting practice. These individuals desired a safe and secure investment, operated in a manner consistent with their religious principles and by a trusted community figure, their local accountant.

What the investors got was anything but safe and secure. Defendant Riehl made false and fraudulent claims about the safety and profitability of the investment and about the use of investor proceeds. He diverted investor funds to Trickling Springs Creamery, a failing (and now bankrupt) business of which he was the majority owner. He also used investor funds to pay

himself and to make a largely uncollectable $6 million loan to a co-conspirator's business. His investors, by contrast, have lost almost everything.

These investors deserved better than this. They trusted him with their life savings and the fruits of their labor, and he betrayed their trust. Defendant Riehl had many opportunities to own up to the fact that his investment program and the Trickling Springs Creamery were insolvent and failing. Instead, he continued his fraudulent scheme and his lies, taking in more investor funds and causing even greater losses.

The government respectfully suggests that a sentence within the advisory Guidelines range of 151 to 188 months' is appropriate. A sentencing hearing is set for July 20, 2020.

## II.     HISTORY OF THE CASE

### A.     The Riehl Investment Program

Defendant Philip Elvin Riehl ("Riehl") was an accountant operating as "Riehl Accounting," with offices in Bethel Township, Berks County, Pennsylvania. As part of his accounting practice, defendant Riehl provided accounting and tax preparation services, catering primarily to his co-religionists in the Mennonite religious community.

Since approximately the late 1990s, defendant Riehl operated an investment program (the "Riehl Investment Program"), whereby investors would send funds to defendant Riehl in exchange for a promised return of interest. Investments in the Riehl Investment Program took the form of promissory notes. Interest rates would be fixed or floating and could vary based on the size of the investment, the date of maturity, and the prime rate. Generally, investors were promised rates of return of about 4½% or 5%. Defendant Riehl and the Riehl Investment

Program would use invested funds to make loans to borrowers. Interest on the loans to borrowers would then purportedly be used to provide the rate of return to investors.

Investors in the Riehl Investment Program were generally members of the Mennonite or Amish religious communities who desired a safe and secure investment for their moneys, operated within their community and in a manner consistent with their religious principles. By late 2018, there were hundreds of investors in the Riehl Investment Program, located in Pennsylvania, in other states, and outside the United States.

    B.    **Trickling Springs Creamery**

Trickling Springs Creamery, LLC ("Trickling Springs Creamery") was a Pennsylvania limited liability company with its principal place of business in Guilford Township, Franklin County, Pennsylvania. Trickling Springs Creamery was in the business of manufacturing dairy products, including organic and non-GMO milk, which was then sold from its retail locations in Pennsylvania and the District of Columbia. By at least 2017, defendant Riehl was the majority member of Trickling Springs Creamery, with a 64½% ownership stake. The rest of the company was owned by three individuals, who owned 2½%, 15%, and 18%, respectively.[1]

Beginning around 2010—when defendant Riehl increased his involvement in Trickling Springs Creamery—the creamery was the beneficiary of a growing level of "loans" from the Riehl Investment Program. As of June 2018, Trickling Springs Creamery owed the Riehl Investment Program about $22 million. These funds essentially propped up a business that was, at best, only marginally profitable and unable to meet all of its working capital needs

---

[1] The 2½% owner is identified in the Information as "Person #1" and Riehl's co-conspirator.

through conventional bank loans. In addition, defendant Riehl and his co-conspirators solicited direct investments in the creamery. By June 2018, about $12 million in principal and accrued interest was owed to these direct investors.

In September 2019, Trickling Springs Creamery announced that it was closing its operations, and, in December 2019, it filed a voluntary bankruptcy petition.[2]

### C. Defendant Riehl's Misrepresentations to Investors

Defendant Riehl pitched the Riehl Investment Program as a safe and secure investment.  Among other things, he told investors and prospective investors that the Riehl Investment Program's portfolio of loans was diversified, such that loans were not concentrated in any one industry. He also told investors that he required two co-signers for each loan, thereby reducing the risk of investing. And he told them that the Riehl Investment Program was profitable.  Indeed, defendant Riehl issued periodic "Investment Account Statements" to investors that purported to show interest earned and steadily increasing account values.

In reality, the Riehl Investment Program was a house of cards, and Riehl's pitch a set of well-crafted lies. Thus, for instance, the program wasn't diversified at all—up to approximately 40% of the outstanding loans were to a single business, the Riehl-owned Trickling Springs Creamery. Nor was it the case that all of the loans were secured by two co-signers. Most notably, the sizable loans to the creamery were not so secured. Nor was the Riehl Investment Program profitable in any sense of the word; rather, it was plagued by defaults and uncollectible debts.

---

[2] In re Trickling Springs Creamery LLC, No. 1:19-bk-05202 (Bankr. M.D. Pa. Voluntary Chapter 7 Petition filed 12/6/2019).

Thus, the "Investment Account Statements" were pie in the sky. Despite what defendant Riehl told his investors in those statements, he knew he couldn't repay them close to what he had led them to believe they had in their investment acounts—at least not without taking in new investor money. The statements and the other misrepresentations played a crucial role in the scheme—defendant Riehl was able to convince his investors that they were investing in a simple community-based loan program, whereby defendant Riehl played middleman between willing lenders and borrowers in need of funds. In reality, defendant Riehl was operating a massive, undisclosed venture capital fund in support of a single, failing business of which he was the majority owner.

In January 2019—as the scheme was collapsing—defendant Riehl sent a letter to his investors admitting to this fraud:

> Dear Friends,
>
> I share the following with a deep burden to be transparent before you and as clear before God as I know how.
>
> I am deeply sorry for all of the trauma I have caused you as a group of investors.   I feel the need to acknowledge the following things to you:
>
> 1.  I should have gotten more advice from brethren.   I was presumptuous in thinking I could manage such a lending business alone.
>
> 2.  I am sorry for any form of dishonesty I am guilty of, and for my part in any false impressions.
>
> This includes stating repeatedly that I require two signatures for each loan.   This gave a false sense of security, in that such a considerable percentage of funds were channeled into my personal projects.
>
> Furthermore, as the situation became more desperate, I should

>have known that my commitment in returning short term loans was too optimistic.   I should have been transparent with how the situation really was.
>
>3.   Some of you may recall statements that claimed I was under others' observation or direction.   I acknowledge the information given to those who were observing was not adequate for their advice to mean much.
>
>My commitment to you is full transparency.   Also, all of my resources are available to help meet my obligations.
>
>I want, beyond all, to be ready to meet my Lord and Savior.
>
>Pray for me in this agonizing situation.
>
>Your Unworthy brother,
>
>[Signed] Philip E. Riehl

D. **The Trickling Springs Creamery Fraudulent Securities Offering**

In addition to his investment fraud related to the Riehl Investment Program, defendant Riehl also defrauded investors through direct investments in Trickling Springs Creamery. Beginning around 2015, defendant Riehl and Person #1 solicited investments in Trickling Springs Creamery, which took the form of promissory notes, with the creamery promising rates of return of about 4½% or 5%. Defendant Riehl and Person #1 prepared and furnished to investors offering materials for investments in the creamery, which contained materially false or misleading statements about the creamery, including about large contractual arrangements it purportedly had, which it either did not have or which were exaggerated or misleading. Further, defendant Riehl portrayed Trickling Springs Creamery as a successful business worth about $20 million to $40 million, when, in reality, it was losing money and was being propped up by investor funds and transfers of moneys from the Riehl Investment Program.

Defendant Riehl and his co-conspirators failed to fully disclose to investors the creamery's dire financial condition.

### E. Prior Civil Investigations of Riehl

Without doubt, defendant Riehl, in this criminal case, has accepted responsibility for his wrongdoing, and the government has stipulated, as part of his guilty plea agreement, that he is entitled to a three-level reduction of his offense level in light of that acceptance. The government can also attest that defendant Riehl has provided assistance in the identification of assets, which has helped the government marshal those assets for the ultimate benefit of the victims of the scheme.[3]

But it is important to note that there were two prior civil investigations of defendant Riehl in which he did not exhibit that kind of acceptance, and, at times, resorted to lies to keep regulators from learning the full scope of his fraud.

#### 1. The SEC Investigation of Riehl and His Accounting Firm

On September 22, 2016, defendant Riehl testified, under penalties of perjury and pursuant to an investigatory subpoena, before officers of the U.S. Securities and Exchange Commission (the "SEC") in Philadelphia, Pennsylvania (the "SEC Testimony"). During his SEC Testimony, he testified that the Riehl Investment Program lacked sufficient funds to pay investors and that he was having difficulties collecting on debts owed by borrowers. He also testified that his valuation of Trickling Springs Creamery of $20 million to $40 million was pure

---

[3] Unfortunately, much of the money is gone. The government has been able to collect about $1 million in cash and personal property and has identified real property (albeit largely mortgaged). The government expects to attempt to collect on the Riehl Investment Program's loans, though with the largest borrower in bankruptcy (and those loans being unsecured), the victims cannot expect to receive in actual restitution anywhere close to what they lost.

speculation and that Trickling Springs Creamery had only been marginally profitable and had been unable to obtain conventional financing from a bank to meet its working capital needs.

During his SEC Testimony, defendant Riehl also testified that he always required two co-signers for loans made from the Riehl Investment Program, when that was not, in fact, true.  And he testified that he was not taking new investments and was in the process of winding down the Riehl Investment Program. The SEC staff subsequently concluded its investigation without any enforcement action being taken.

Despite his assurances to the SEC, defendant Riehl continued to raise investor funds even after his SEC Testimony. Based on records obtained during this criminal investigation, Riehl raised approximately $6.7 million between October 2016 and June 2018.[4] Putting aside that defendant Riehl was doing precisely what he told the SEC he wasn't—i.e., raising more money—he was doing this _after_ he had admitted to the SEC that the Riehl Investment Program was out of money and collapsing.

Further, during the post–SEC Testimony time period, defendant Riehl "reloaded" on prior investors, soliciting them for purported "short term loans," apparently as part of a last-ditch effort to keep the scheme going. For instance, in April 2017, defendant Riehl took a short term loan of $100,000 from victim and prior investor G.W., who is still owed over $600,000.

---

[4] This figure is based on documentation provided by defendant Riehl (and does not include additional amounts directly invested in Trickling Springs Creamery).  Because the records necessary to calculate post–September 2016 investments only went through June 2018, it is possible that this figure understates the Riehl Investment Program's money raising activity after defendant Riehl's SEC Testimony.  The crucial point, however, is that defendant Riehl was continuing to raise substantial sums, not only contrary to his representation to the SEC, but even after it must have been clear to him—based on his own SEC Testimony—that the scheme was collapsing and that new investor money was the only way prior investors could be repaid.

And, in August 2017, defendant Riehl solicited a short term loan of $184,000 from victim and prior investor M.G., who is still owed over $300,000.[5]

## 2. State Administrative Proceeding

The SEC investigation was not the only civil investigation of defendant Riehl. In 2018, the Pennsylvania Department of Banking and Securities brought charges against defendant Riehl, Trickling Springs Creamery, and defendant Riehl's creamery co-owners, alleging fraud in violation of the Pennsylvania Securities Act of 1972. Instead of entering into a consent order and agreeing to cease the conduct, defendant Riehl and the other respondents contested the charges, resulting in a trial before a hearing officer, who found for the state agency and against the respondents and ordered them to pay $4.35 million in civil penalties and barred them from selling securities. The hearing officer's findings were subsequently confirmed by the Pennsylvania Department of Banking and Securities.[6]

The point is not that a person must immediately roll over for his regulator or that he is not entitled to mount good faith defenses (though, to be sure, defendant Riehl was not

---

[5] The parties stipulated to a two-level vulnerable victim enhancement under USSG § 3A1.1. Going back to prior investors to take in additional funds is classic Ponzi scheme conduct, and when it is perpetrated against those who previously fell for the scam, it supports such an enhancement.  See United States v. Hoffecker, 530 F.3d 137, 201 (3d Cir. 2008) ("Though we see no reason why the term could not be used to describe repeated legitimate solicitations, we are dealing here with a fraud case where 'the repeated targeting of [the] victim, a practice called "reloading," constitutes evidence that the defendant knew the victim was particularly vulnerable to the fraud scheme.'" (quoting United States v. Day, 405 F.3d 1293, 1296 (11th Cir. 2005))).
[6] See generally Commonwealth of Pennsylvania Dep't of Banking & Sec., Bureau of Sec. Compliance & Examinations v. Trickling Springs Creamery, LLC, No. 180099 (SEC-OSC), slip op. (Pa. Dep't of Banking & Sec. Jan. 30, 2020) (assessing $4.35 million in civil penalties and ordering the respondents barred from securities activities) [hereinafter, "State Administrative Proceeding"].  This order is on appeal to the Pennsylvania Commonwealth Court by certain of the respondents, but not defendant Riehl.

entitled to lie to the SEC). Rather, the point is that defendant Riehl—over several years—thwarted one regulator and forced another to engage in a protracted administrative proceeding. Thus, although defendant Riehl accepted responsibility in this criminal proceeding, his acceptance of his wrongdoing in a broader sense was a long time in coming, during which he continued to defraud his victims and forestalled the detection of the scheme.

F. **Investor Losses**

As of December 2019, there was a total of about $59,688,297.97 that was invested by investors in the Riehl Investment Program and Trickling Springs Creamery that had not been repaid to those investors (which amount does not include accrued interest).[7] There are approximately 460 victims of the scheme. As discussed in the victim impact letters, the invested funds represented victims' life savings, retirement funds, and moneys needed for future medical and long-term care. The problem here is even more acute because members of these religious communities generally do not pay into the Social Security system (and, thus, do not draw benefits), nor do they have pensions or insurance in the traditional sense.

---

[7] This calculation of loss amount was based on records provided by defendant Riehl during this criminal investigation and has been stipulated to by the parties. As noted, it excludes accrued interest, but it may include interest already credited to an investor's account (essentially, reinvested investment "gains"). Although bank records generally corroborate these figures, there is some inherent imprecision in the analysis, which is why the application note to USSG § 2B1.1 states that "[t]he court need only make a reasonable estimate of the loss." USSG § 2B1.1, comment. (n.3(C)). For instance, in the State Administrative Proceeding, the hearing officer found, and the Banking and Securities Commission affirmed, that "[a]t its peak, Respondent Riehl had borrowed approximately $79,000,000 from the Riehl Investors through the Riehl Loan Program," and this amount does not include direct investments in Trickling Springs Creamery, which amounted to millions more. See State Administrative Proceeding (hearing officer's finding of fact no. 14). The government's position is that the stipulated figure is a "reasonable estimate of the loss."

## III. SENTENCING CALCULATION

### A. Statutory Maximum Sentences

The statutory maximum sentences are as follows: for Count One (conspiracy)—5 years' imprisonment, a 3-year period of supervised release, a $250,000 fine, and a $100 special assessment; for Count Two (securities fraud)—20 years' imprisonment, a 3-year period of supervised release, a $5,000,000 fine, and a $100 special assessment; for Count Three (wire fraud)—20 years' imprisonment, a 3-year period of supervised release, a $250,000 fine, and a $100 special assessment.

Thus, the total maximum sentence is 45 years' imprisonment, a 3-year period of supervised release, a $5,500,000 fine, and a $300 special assessment. Full restitution shall be ordered.   Forfeiture of $59,688,297.97 also may be ordered.

### B. Sentencing Guidelines Calculation

The government agrees with Probation that the following Sentencing Guidelines calculation applies to defendant Riehl:

Group 1 (conspiracy to commit securities fraud and wire fraud)

| | | |
|---|---|---|
| Base offense level | § 2B1.1(a)(1) | 7 |
| Loss amount greater than $25,000,000 | § 2B1.1(b)(1)(L) | +22 |
| Ten or more victims | § 2B1.1(b)(2)(A)(i) | +2 |
| Sophisticated means | § 2B1.1(b)(10) | +2 |
| Vulnerable victim | § 3A1.1(b)(1) | +2 |
| Abuse of trust | § 3B1.3 | +2 |
| **Adjusted offense level** | | **37** |

| | | |
|---|---|---|
| Acceptance of responsibility | § 3E1.1 | –3 |
| **TOTAL OFFENSE LEVEL** | | **34** |

Counts One, Two, and Three group. With an offense level of 34, and a Criminal History Category of I, defendant Riehl faces an advisory sentencing range of 151 to 188 months' of imprisonment.

## IV.  ANALYSIS

### A.  Legal Standard

After the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), the Sentencing Guidelines have only advisory force, and the Court of Appeals for the Third Circuit has thus interpreted Booker to require the following three steps:

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before Booker.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-Booker case law, which continues to have advisory force.
>
> (3) Finally, they are required to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

United States v. Charles, 467 F.3d 828, 830–31 (3d Cir. 2006) (citations omitted).

### B.  A Sentence Within the Advisory Guidelines Range Is Warranted

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007). Here, as noted above, the Guidelines yield an

advisory range of 151 to 188 months' incarceration. For the reasons set forth below, and after consideration of the Section 3553(a) factors, it is the government's position that a sentence within that range is appropriate.

The Section 3553(a) factors include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (iii) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (iv) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (v) the guidelines and policy statements issued by the Sentencing Commission; (vi) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (vii) the need to provide restitution to any victims of the offense. See 18 U.S.C. § 3553(a).

1. **Nature of the Offense and Characteristics of the Defendant**

Defendant Riehl's investors trusted him. He touted his ties to the community and, as an accountant, held a position of trust. As the accountant and tax preparer for the community, he knew who had money to invest. He convinced them that he offered a simple and safe alternative to the big banks, whereby funds would be loaned to other community members, and all loans would be co-signed by two others.

In reality, he was operating a sophisticated scheme in which funds were taken from the Riehl Investment Program and sent to a separate entity, Trickling Springs Creamery. The evidence also shows that defendant Riehl's majority stake in the creamery was largely (if

13

not entirely) purchased using funds from the Riehl Investment Program. In other words, he used other people's money to finance his ownership of the creamery.

His diverting of others' funds into such "personal projects" (in the words of his January 2019 letter to investors) had dire results. The creamery was failing and not worth nearly as much as touted.  It also—tragically—accounted for a significant percentage of the Riehl Investment Program's outstanding loans. Worse, the creamery wasn't the only bad debt on the Riehl Investment Program's books. And, as is made clear in Riehl's own 2016 SEC Testimony, he was aware of all of this, while continuing to take money from investors.

Thus, this was not a momentary lapse. There were many opportunities for defendant Riehl to be honest with investors. Instead, he pressed on, and even solicited additional purported "short term" investments, long after it was clear that there was no way to make good to the existing investors.

**2.      The Need to Reflect the Seriousness of the Crime, to Promote Respect for the Law, and to Provide Just Punishment**

Hundreds of investors lost almost $60 million in this securities fraud. This is a serious crime that robbed them of their hard-earned savings, their retirement funds, and moneys needed for future medical and long-term care. Further, the investors' trust was violated.

Securities fraud is serious, not only because of the impact on investors, but also for its effect on our financial system. Investors and prospective investors should be able to trust the representations made to them. Public trust facilitates capital formation. But, when that trust is called into doubt, our system becomes less efficient, to the detriment of both prospective investors and those in need of financing.

### 3. The Need to Provide General and Specific Deterrence

Unfortunately, these kinds of financial frauds occur all too frequently. A strong message should be sent to those involved in or contemplating such a large-scale fraud that they will be dealt with appropriately. As for defendant Riehl, even an SEC investigation did not cause him to cease his conduct, suggesting that a sentence within the advisory Guidelines range is warranted.

### 4. The Need to Provide the Defendant with Training, Medical Care, or Other Correctional Treatment

According to the Presentence Investigation Report, "the defendant described his physical health as 'decent.'" (PSR ¶ 89.) Defendant Riehl only completed a portion of the tenth grade. (PSR ¶ 94.) He also received annual training during the time he was operating Riehl Accounting. (PSR ¶ 95.)

### 5. The Sentencing Commission's Guidelines and Policy Statements

Here, the advisory Guidelines range appropriately reflects the seriousness of defendant Riehl's offenses. A key driver of that range is the 22-level enhancement for a loss amount of more than $25 million. USSG § 2B1.1(b)(1)(L). As discussed herein, the loss amount was well in excess of $25 million. The structure of the Guidelines supports the common sense conclusion that larger, more widespread frauds warrant more significant punishments. Other aspects of defendant Riehl's offenses support the conclusion that a sentence within the advisory Guidelines range is appropriate, including the fact that he abused his position as an accountant. See USSG § 3B1.3, comment. (n.1) ("Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.").

### 6. The Need to Avoid Unwarranted Sentencing Disparities

The need to avoid unwarranted sentencing disparities may be achieved through the careful calculation and review of the Guidelines range. See, e.g., Gall, 552 U.S. at 54 ("Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities.").

### 7. The Need to Provide Restitution

The government intends to submit a proposed restitution order. The amount of investor losses is $59,688,297.97.

## V. CONCLUSION

For all of the foregoing reasons, the government respectfully submits that the defendant should be sentenced to a term of imprisonment within the advisory Guidelines range of 151 to 188 months' imprisonment, to 3 years of supervised release, and to pay a special assessment of $300, forfeiture of $59,688,297.97, and restitution of $59,688,297.97.

Respectfully submitted,

WILLIAM M. McSWAIN
United States Attorney

Dated: July 13, 2020.

s/ Michael J. Rinaldi
MICHAEL J. RINALDI
Deputy Chief, Economic Crimes
Assistant United States Attorney